## COURT OF APPEALS,
### Dec. 13, 1910.

# THE PEOPLE v. SAMUEL D. FORD.

### (200 N. Y. 209.)

(1.) MURDER—EVIDENCE—PREMEDITATION AND DELIBERATION.

The evidence upon the trial of a defendant, charged with murder in the first degree, reviewed and *held*, that such evidence is sufficient to warrant the finding that the crime was committed with deliberation and premeditation, and, further, that the facts and circumstances are such as to exclude any hypothesis except that of the defendant's guilt.

(2.) SAME.

It was not error to receive, upon such trial, the evidence of the men who arrested the defendant as to his statements to them or in their presence, where none of such statements was made as the result of any promise or threats, nor induced by fear, and where it appears that whatever the defendant did say was voluntary and in the course of conversations.

(3.) SAME—VOLUNTARY STATEMENTS OF DEFENDANT.

The fact that the prosecuting attorney, in cross-examining the defendant, directed his attention to the testimony of certain witnesses and asked him to state whether it was true or false, did not prejudice the defendant.

(4.) SAME—IMPROPER CROSS EXAMINATION BY DISTRICT-ATTORNEY.

The district attorney also asked the defendant whether he meant to say that a statement of certain witnesses was a " lie." This exceeded the proper bounds of examination, and was unnecessary because affecting the atmosphere of the trial; but where the defendant's answer contained no such characterization, it does not constitute legal error.

(5.) SAME—FAIRNESS OF TRIAL.

The fairness of defendant's trial in a capital case must be considered by the court.

APPEAL from a judgment of the Supreme Court, rendered September 30, 1909, at a Trial Term for the county of Ulster, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*William D. Brinnier* for appellant. The evidence of the People, upon the trial, was insufficient to warrant a verdict for murder in the first degree. The verdict of the jury was, therefore, erroneous and should be set aside and a new trial granted. (Penal Code, §§ 181, 183; *People v. Place,* 157 N. Y. 584; *People v. Mangans,* 29 Hun. 259.) The court erred in receiving, under defendant's objections and exceptions, the evidence of Cole, Woolheater and Gleason as to statements made to them, or in their presence, by the defendant, while under arrest, charged with the crime of murder, and when arraigned before the committing magistrate. (*People v. McMahon,* 15 N. Y. 384; *People v. Mondon,* 103 N. Y. 211; *People v. Kennedy,* 159 N. Y. 346; 1 Ency. of Evidence, 357.) The method of examination was unfair and highly prejudicial to the defendant. (*Mitchell v. Carter,* 14 Hun, 448.

*William D. Cunningham, District Attorney,* for respondent. The court did not err in receiving the testimony of witnesses Cole, Gleason and Woolheater, as to statements and declarations made by the defendant in their presence after his arrest. (Code Crim. Pro. § 395; *Teachout v. People,* 41 N. Y. 7; *Kelley v. People,* 55 N. Y. 565; *Murphy v. People,* 63 N. Y. 590; *Balbo v. People,* 80 N. Y. 484; *Cox v. People,* 80 N. Y. 500; *People v. McGloin,* 91 N. Y. 241; *People v. Mondon,* 103 N. Y. 211; *People v. Druse,* 103 N. Y. 655; *People v. Chapleau,* 121 N. Y. 266; *People v. Kennedy,* 159 N. Y. 346; *People v. Rogers,* 192 N. Y. 331.)

GRAY, J.:

The defendant was charged with the crime of murder in the first degree, committed upon Captora Ashe by striking and cutting her with a razor. Her death by violent means was not disputed; but the defendant denied that he was guilty. The trial, which followed upon his indictment, resulted in a verdict of guilty and the defendant now appeals to this court. Captora Ashe, for whose murder the defendant has been held responsible, had been known as Katie Ashe, or Ford. The evidence is such as to leave it somewhat in doubt whether she was his wife or mistress; but it is more probable upon his evidence, as well as that of other witnesses, that she stood in the latter relation to him. In the evening of March 27th, 1909, the deceased came to the hospital at Brown's Station, in Ulster county, and died within twenty or twenty-five minutes after her admission. Upon her person were found five wounds, which had been inflicted by a sharp instrument. One wound extended from a point behind the left ear, at the mastoid portion of the skull, downwards and across the throat, for over five inches, severing all of the blood vessels and muscles down to the bone. Another wound was from above the left eye down to the ear; another was from above the right eye to, and through, the right ear; another was upon the right forearm and another upon and across the left shoulder. The first wound was sufficient to cause death.

The evidence connecting the defendant with the commission of the crime charged was, wholly, circumstantial; but the nature of the facts disclosed and the order of succession of events, preceding and following the homicide, were such as to compel the conclusion that the verdict of the jury was fully justified. However reluctant the mind to conclude upon such evidence, ordinarily, there was, in this case, no such weakness in any link of the chain of circumstances, which, by affecting its strength, would warrant the entertaining of a reasonable

doubt of the defendant's guilt. The defendant and the deceased were colored persons and came from New York to Ulster county; where Ford found employment under the contractors who were constructing the dams and reservoirs for the new aqueduct. On Saturday, March 27, 1909, the defendant was discharged from his employment. He and the deceased were then residing at Brown's Station, in a house occupied by a colored couple named Parish. In the afternoon of that day, he quarrelled with the deceased upon her demand for a pair of shoes and for some money; denying that he had drawn his wages. Refusing to pay Parish what was due for their lodging, he was told to leave. When, that evening, about to do so, the deceased told him that she did not want to go with him, that "she did not belong to him and that she did not want to go with him any further." She was heard to say to him "Go on, Sam, and leave me alone. I don't want to go. I am barefooted and I have no shoes, and I'm hungry and tired of following you. I'm not your wife." He said that she must go and taking her by the arm, he pulled, or led, her out. This occurred a few minutes after eight o'clock. They proceeded a short distance to the neighboring house of another colored couple, named Cunningham; where he asked to be lodged for the night. When admitted, the deceased, at first, was unwilling to enter with the defendant; but, finally, consented to do so, saying: "In the morning I will go back to New York and that will settle it all." Within a few minutes, the deceased came out of the room prepared for them; saying that she was not going to stay and insisting upon leaving the house. The defendant wished the Cunninghams to keep her in the house; but they refused and the defendant, who had previously locked the door, was obliged by them to open it. The defendant, first, left the house and, as he did so, the deceased quickly closed and locked the door upon him. She wanted to go out by another, the back, door and, possibly had she been permitted to do so,

she had escaped the tragedy in which she lost her life. The
Cunninghams made her leave by the front door. Within
fifteen or twenty minutes from the time they left, the Cunning-
hams, as did other witnesses residing in the neighborhood,
heard screams, seemingly, from some point on the road to the
hospital. The hospital was distant about a quarter of a mile
and residents of houses along the road heard, and were awak-
ened by, these screams. The wife of one of them testified to
the coming of the deceased to their door and to her calling
for her and asking that her husband should go with her, that
she was " hurt; " but he was ill in bed. The next morning,
the witness found a " lot of blood " on the stones in front of
the door. The deceased went on to the hospital. As she en-
tered, she was bleeding profusely and, falling into a chair,
became unconscious within five minutes, and, within twenty
or twenty-five minutes, was dead. Sunday morning a watch-
man and a police officer followed up the traces of blood from
the hospital to a point upon the road, where the ground was
much disturbed by the trampling of feet and was splashed with
blood. One of them picked up from the muddy ground a thin
piece of steel, peculiar in shape and with an edge. On Mon-
day, a suit case of the defendant, which he had with him when
leaving the Cunninghams' house, was found in some bushes,
along their fence. After noon of the day after the homicide,
the defendant was arrested, at a point on the Ulster and Dela-
ware railroad, some thirty, or more, miles from Brown's Sta-
tion, and was taken to the office of a justice of the peace at
Margaretville; where, his person being searched, there was
found, among other things, a blue handled razor with a piece
broken from the blade. A smear, or discoloration, upon the
blade, subsequent chemical tests showed to be from human
blood. Spots upon the hat of the defendant, also, upon sub-
sequent tests, proved to be human blood. The piece of steel,
which had been picked up from the road at Brown's Station,

fitted with exactness into the broken portion of the razor blade. At the time of his arrest, he, at first, gave a false name; denied that he had come from Brown's Station, and said that he had broken his razor in mending his shoe, and that the blood came upon it while he was doing so. The person, who arrested him, had done so at the request of, and upon the description by, the sheriff, given through the telephone. The next morning he was taken to Kingston; where the indictment was found against him. The record does not disclose that there was any prior arraignment of the defendant and nothing seems to have taken place at the office of the justice of the peace beyond the search of his person. After being taken into custody, in conversation with the man, who arrested him, and with the driver of the vehicle, in which he was driven to Margaretville, the defendant admitted that he had been at Brown's Station. He stated to them that he had had trouble with a woman there, who was not his wife; that he had walked from Brown's Station, starting about nine o'clock the night before, and that he was going to the coal fields of Pennsylvania. It was shown that he left Brown's Station with nine dollars of his wages owing to him. Witnesses testified to quarrels between the defendant and the deceased; to his maltreatment of her and to threats against her life. On the Sunday morning previous to the homicide, the defendant had asked Mrs. Parish to give him his razors, which had been in her possession. There were two of them; one being black and the other blue, in color. The black one he put into his suit case and the blue one he placed in his pocket. Mrs. Parish identified the broken razor found upon his person as the one given to him that Sunday morning. On Sunday evening, the defendant had left Parish's house with the deceased and, in about an hour, returned alone; stating that Katie had run away from him. A few minutes later, she came in and said that the defendant had taken her over to a part of the works; that he had his razor in his pocket and that

he had threatened to kill her. All that he appears to have said to this was, to the effect, that, if he had said so, he did not do it; to which she replied, " No, because I ran away and left you — you didn't get the chance to do it."

The defendant was examined in his own behalf and denied having killed the deceased. He testified that he had no knowledge of her movements after they went out of Cunningham's house and that he, first, knew of her death from the officer who arrested him. He admitted having left Brown's Station at about nine o'clock Saturday evening and that he had walked all that night and the next day to the place where he was arrested; except that during the night he had slept for about an hour and a half in the depot of a station upon the railroad. He said that he had intended to leave the deceased with some one and to find work in the Pennsylvania coal fields; that the blade of the razor was broken, when he received it from Mrs. Parish; that he had kept it as it might be useful some day or other; that he had left his suit case in Cunningham's porch and that he could get the money owing him for wages by writing. He denied having made threats to the deceased; though admitting that they were not " on the best of terms." He said the deceased was in the habit of drinking and that, upon several occasions, she had threatened to commit suicide and in such a manner as to induce others to believe that he had killed her. In substance, his evidence amounted to this: that they had lived inharmoniously together and that, in leaving Brown's Station that evening, he was but carrying out an intention, already formed, to leave her and to find work at some other place; that he had no part in her death and knew nothing of what happened to her after they separated at Cunningham's door. His story was unsatisfactory in essential particulars and it insufficiently explained his departure from Brown's Station, within a few minutes after they had gone out of Cunningham's house, and his walking through the night and

the next day, leaving behind him the suit case concealed in the bushes and the wages owing him. It had the appearance of a flight prompted by the apprehension of a guilty mind. It is improbable that he should not have known where the deceased. was going; or that he should not have heard the screams, which aroused the neighborhood which he was then leaving.

Upon this somewhat extended review of the evidence, I think the conclusion to be clear that the defendant killed the deceased by striking her with a razor blade, within a few minutes after they left the house of Cunningham. From the nature and location of her wounds, it is altogether improbable that they could have been self-inflicted and the theory of suicide is quite inadmissible. It is inconceivable that a person intending suicide would slash himself in such extraordnary places, or that he could have inflicted the wounds upon the right forearm and back of the left shoulder. While, therefore, the evidence was such as to make it incredible that the woman had killed herself; nevertheless, that question, as one of fact, was submitted by the trial court to the jurors and it was determined by them. That any third person could have killed her is not a reasonable supposition upon this record. It does not appear that any other person had any motive for assaulting her. If the jurors believed that the defendant had killed the deceased, it was unnecessary that the existence of any motive should have been proved. They could readily have found a motive in the woman's determination to leave him and to return to New York the next day. His determination to prevent her, if not jealousy, may have been mere brutish unwillingness to have her go. The evidence, sufficiently, warranted the finding that he killed her deliberately and with premeditation. The possession and the use of a razor, and the nature of the several wounds upon her body, would justify such a conclusion. The case was submitted to the jurors upon a charge so full and so impartial in its tenor that it was not

excepted to; nor was there any request for further instruction. I do not think that the jury could have rendered any other verdict than they did, which would have been consistent with the evidence. The facts and circumstances, taken together, point with irresistible force to the one conclusion of the defendant's guilt and exclude any other hypothesis. When the combination of the facts is such as to establish the one conclusion, as the only reasonably possible one, it should be as fully satisfactory to the mind as the direct testimony of eye-witnesses; dependent as that must so often be for its conclusiveness upon their character for truthfulness, bias, or accuracy. So far as certainty may be predicated of the administration of human justice, I think it was attained in the verdict of this jury.

The objection to the sufficiency of the evidence to support the verdict has been covered by what I have said. It is argued that it was error to receive, over the defendant's objections, the evidence of the men who arrested him as to his statements to them, or in their presence. Although the defendant was in custody, none was made as the result of any promises, or threats, nor was any induced by fear. There is no evidence to show what, if anything, took place in the justice's office at Margaretville beyond the search of his person. Whatever the defendant did say, that was at all material, appears to have been voluntary and in the course of conversations elsewhere. There were no confessions and I find no violation of the rules regulating the admissibility of a prisoner's statements. The only other objection, which I need refer to, is that made by the defendant to the form of certain questions asked by the district attorney, when cross-examining the defendant. It is argued that they were improper, as requiring him to characterize the evidence of witnesses for the People and, therefore, tending to prejudice him before the jurors. The district attorney, in directing the attention of the defendant to the testimony of witnesses which conflicted with that which he had

given, in several instances, sought to have him state whether it was true or false. I can perceive no ground for holding that that constituted legal error. In one instance, however, I think that the district attorney exceeded the proper bounds of examination in asking the defendant to state whether he meant the jury to understand that a statement of certain witnesses was a "lie." The answer contained no such characterization and, therefore, no prejudice could have accrued to the defendant's case. While not legal error, to pursue such an inquiry is as objectionable, as it is unnecessary, because affecting the atmosphere of the trial. The fairness of the defendant's trial, in a capital case, must be considered by this court.

After a careful consideration of the record, on this appeal, I find no ground upon which a reversal of the judgment of conviction would be justified and I advise that the judgment be affirmed.

CULLEN, Ch. J., HAIGHT, VANN, WILLARD BARTLETT, HISCOCK and COLLIN, JJ., concur.

Judgment of conviction affirmed.